# UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

|  |  |  |
|---|---|---|
| JOHN COHEN, *as next friend and personal representative of the Estate of Eric Cohen*, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Docket No. 2:21-cv-00267-NT |
| CITY OF PORTLAND and RONALD GIROUX, JR., | ) ) ) | |
| Defendants. | ) ) | |

## ORDER ON DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

Before me are motions for summary judgment from Defendant City of Portland
("**City**" or "**Portland**") (ECF No. 97) and Defendant Ronald Giroux, Jr. (ECF No. 99).
For the reasons stated below, the motions are **GRANTED**.

## FACTUAL BACKGROUND[1]

### I.    Cohen Attacks His Girlfriend and a Bystander

On April 12, 2020, at approximately 1:16 p.m., Portland Police Department
officers were dispatched near the Miss Portland Diner on Marginal Way to respond
to an assault in progress. Stipulated Facts for City of Portland's Mot. for Summ. J.
("**City SF**") ¶¶ 10–11 (ECF No. 93). Upon arrival, officers found a woman ("**CE**")

---

[1]    The following facts are drawn from the parties' stipulated facts and material facts and the
record evidence (including body-worn camera footage). Where not explicitly referenced, I have
considered each party's qualifications and denials to the other side's asserted material facts, and
recited the facts as supported by the record and in the light most favorable to Cohen, the nonmoving
party.

bleeding from her nose and mouth, with both eyes becoming blackened and swollen. City SF ¶¶ 11–12. CE told the officers that her boyfriend, Eric Cohen, had just attacked her. City SF ¶ 11. A bystander corroborated CE's account. City SF ¶¶ 17–18. He saw Cohen punch CE, and when she fell to the ground, Cohen continued to hit and kick her. City SF ¶ 18. The bystander intervened to try and stop Cohen from attacking her, and Cohen punched the bystander as well. City SF ¶ 18. When he fell down, Cohen kicked him in the head. City SF ¶ 18. A second witness told an officer that he thought CE may have died if the bystander had not intervened because Cohen did not otherwise show signs of stopping his attack. City SF ¶ 19.

## II.    Cohen Flees the Scene and Portland Police Begin a Search

CE explained to the officers that Cohen had stripped off his clothes, fled the scene, jumped a fence, and ran onto or towards the highway. She also relayed that Cohen had not been taking his medication for the last couple of months. City SF ¶ 20. A Portland officer reported back to dispatch that a male suspect who may be having a "mental break" was naked and running on the interstate. City SF ¶ 21. He requested that dispatch contact both state and local police to help locate him. City SF ¶ 21. As part of their call for help to Portland police, dispatch broadcasted that the person was fleeing from "a domestic violence assault/aggravated assault." City SF ¶ 24.

## III.    Police Locate Cohen and He Runs into the Back Cove

At approximately 1:22 p.m., Portland police officer IL and another officer reported to dispatch that they could see Cohen from the highway off-ramp on the shore side. City SF ¶ 28. Officer IL exited his cruiser, jumped over the fence

separating the off-ramp and a walking path, and attempted to make contact with Cohen. City SF ¶ 28. Specifically, Officer IL ran towards Cohen, who responded by running closer to the shore of the Back Cove. City SF ¶¶ 28, 30; Def. City of Portland's Reply Statement of Material Facts ("**City SMF**") ¶ 59 (ECF No. 117).

The Back Cove is a body of water in Portland, Maine with a walking trail around its perimeter, portions of which abut Interstate 295 or the area adjacent to Interstate 295. City SMF ¶ 52. At approximately 1:23 p.m., Cohen ran into the waters of the Back Cove and started swimming away from the shore.[2] City SF ¶ 30. When Cohen entered the water, Officer IL was about 150 feet away from him. City SF ¶ 30. The water temperature was about forty-two degrees Fahrenheit, and the air temperature was about forty-seven to forty-eight degrees Fahrenheit. City SF ¶ 31.

Once Cohen entered the water, Officer IL ran closer to the shoreline and yelled to Cohen: "Hey, come to the shore bud," "this way man," "come get warm, man," and "this way brother" in an attempt to coax him out. City SF ¶ 33; Def. Ronald Giroux, Jr.'s Reply Statement of Material Fact ("**Giroux SMF**") ¶ 4 (ECF No. 119). Officer IL repeatedly asked Cohen to come out of the water, said they needed to talk, and told him that he just wanted to hear Cohen's side of the story. City SF ¶ 33. Cohen began

---

[2]     The parties debate Officer IL's role in Cohen's entry into the water. Cohen asserts that Officer IL chased or forced him into the water. Pl.'s Am. Obj. to Def. City of Portland's Mot. for Summ. J. ("**Pl.'s Obj. to City's Mot.**") 6–7 (ECF No. 112). The City maintains that Officer IL pursued him, but did not chase or force Cohen into the water, or corner him so that his only option to escape was to flee into the water. Def. City of Portland's Mot. for Summ. J. ("**City's Mot. for Summ. J.**") 8–9 (ECF No. 97). The record does not support Cohen's version. As Officer IL approached, Cohen had several options other than entering the water, including submitting to arrest or continuing to flee in either direction on the Back Cove trail.

making grunting and yelling noises. Body Worn Camera of Officer IL 2:43 (ECF No. 92–20).

## IV.    Police Request Fire Boat Assistance

Around this time, Sergeant Christopher Gervais, a supervisor of Portland police patrol officers, spotted Cohen in the water, swimming away from the shoreline. City SF ¶¶ 25, 35. Based on his initial observation of Cohen, Sergeant Gervais did not think he was going to return to shore on his own. City SF ¶ 36. At 1:23:41 p.m., Sergeant Gervais asked dispatch to notify the Portland Fire Department to ready their marine unit (boat) to bring two officers and himself to Cohen's location in the Back Cove for an attempted water retrieval. City SF ¶ 36. Sergeant Gervais told the two officers on the scene to stay where they were in case Cohen swam back to shore, and he left for the boat dock. City SF ¶¶ 37–38.

## V.    Police Consider Water Rescue Options

Meanwhile, around 1:30 p.m., additional officers began arriving on the scene at the Back Cove. City SF ¶ 41. One yelled out to Cohen and tried to use verbal techniques to coax him back to shore. City SF ¶ 42. An officer held a sponge launcher, which is a less than lethal weapon, in case Cohen came out of the water and continued to be combative. City SF ¶ 43. A South Portland police officer, who had been dispatched to help track Cohen when he initially fled, arrived with his K-9 dog, which remained with the officer on a leash. City SF ¶ 44.

Portland Police Detective Sergeant Michael Rand arrived on the scene and spoke with Portland Police Officer Blake Cunningham, a former United States Coast Guard rescue swimmer. City SF ¶¶ 3–4, 41; City SMF ¶¶ 54–55, 68. Officer

Cunningham told Sergeant Rand: "The problem is, this guy has about 15 minutes to live. If he begins to struggle, I will strip, go in and recover him." City SMF ¶ 68. Sergeant Rand responded: "I am sure he is hypothermic by now. We should have the fire boat right off, but I understand what you gotta do." City SMF ¶ 68. Sergeant Rand explained at his deposition that he did not want Officer Cunningham going into the water to get Cohen because of the Department's "Priority of Life" protocols.[3] Dep. Tr. of Michael Rand ("**Rand Dep.**") 45:3-10 (ECF No. 92-7). Specifically, he was concerned that Cohen would behave violently towards Officer Cunningham in the water, and he would have no way of providing backup if Officer Cunningham were to enter the water and get into a physical confrontation with Cohen. Rand Dep. 45:12-17.

## VI.   Fire Boat Travels to the Scene

At approximately 1:34 p.m., the fire boat began making its way to Cohen's location in the Back Cove. City SF ¶ 47. Police and fire personnel chose to travel on the smallest fire boat because Cohen was in shallow water, and it was likely the only boat capable of reaching him. City SF ¶ 40; Giroux SMF ¶ 55; Gervais Body Camera 8:33–11:10 (ECF No. 109-1). The fire boat had waited several minutes at the dock for

---

[3]      Portland Police Department Standard Operating Procedure #40F instructs that when interacting with someone suspected to be experiencing a mental health crisis, officers should utilize relevant training "while following priority of life protocols to enhance scene security, public, officer and subject safety." Portland Police Department Standard Operating Procedure #40F ("**Mental Health SOP**") at PageID #567 (ECF No. 92-9). These protocols are an "assessment process used by officers to determine how best to respond to a situation that is potentially life threatening to a civilian and/or police officer." Aff. of Frank Heath Gorham ("**Gorham Aff.**") ¶ 10 (ECF No. 92-23). They are based on the principle that certain tactics may impose an unacceptable level of risk to innocent parties. Gorham Aff. ¶ 10. Priority of life protocols require that officers first ensure the safety of innocent persons like victims, witnesses and hostages, then the safety of law enforcement personnel, and finally the safety of suicidal individuals or offenders. Gorham Aff. ¶ 10.

Sergeant Gervais and the other police officers to arrive before departing. City SMF ¶ 64. The boat carried three firefighters and three police officers to the Back Cove. One of the firefighters was a paramedic. City SF ¶ 47.

Several minutes later, Officer Cunningham said to Sergeant Rand: "I have watched a lot of people drown and it's not long now." Sergeant Rand responded: "Oh, I know." City SMF ¶ 73. At approximately 1:42 p.m., Sergeant Rand told Officer Cunningham that if he could get a life jacket, he would be okay with Officer Cunningham going into the water. City SF ¶ 48.

## VII.   Fire Department Dispatches Additional Support

At approximately 1:34 p.m., two firetrucks were dispatched to the scene to help the Portland police. City SF ¶ 45. Defendant Ronald Giroux, Jr. drove one of the trucks. Stipulated Facts for Ronald Giroux, Jr.'s Mot. for Summ. J. ("**Giroux SF**") ¶¶ 5–6 (ECF No. 94). Initially both firetrucks went to the Back Cove parking lot, but the trucks were too big to get to where the police were positioned off the Back Cove walking trail. City SF ¶¶ 45–46. The two firetrucks staked out different spots around the Back Cove, because they did not know where the fire boat would be able to beach once they recovered Cohen from the water. City SF ¶ 46. At approximately 1:42 p.m., Giroux's firetruck parked on the highway off-ramp so it could get closer to the Back Cove walking trail. City SF ¶ 49; Giroux SF ¶ 8–9.

## VIII.  Giroux's Role

Just over a minute after Giroux's firetruck arrived on the off-ramp, at approximately 1:43 p.m., Giroux yelled: "tell him we're gonna kick his ass if he gets out of that water." Giroux SMF ¶ 9. Giroux was either in or near the firetruck when

he made this statement, at least seventy-five feet from the shoreline. Giroux SMF ¶¶ 10, 15.[4] He could see that Cohen was in the Back Cove and appeared to be swimming or standing in the water. Giroux SMF ¶ 16. The only information he knew about the person in the water was that he was a suspect involved in an assault.[5] Giroux SMF ¶ 17. Giroux then walked around to the other side of the firetruck to retrieve a saw in case he needed to cut a hole in the metal fence to deploy rescue equipment through it. Giroux SMF ¶ 11. Sergeant Rand asked the firefighters if they had a spare life jacket, and Giroux tossed a life jacket over the fence. City SF ¶ 50; Giroux SMF ¶ 12. While Cohen was in the water, Giroux never went beyond the tall metal fence that separated the edge of the off-ramp from the Back Cove walking path. Giroux SMF ¶ 14.

## IX.    Fire Boat Arrives and MEDCU Requested

At 1:44:13 p.m., Officer Cunningham told Sergeant Gervais that Cohen was starting to go under water. City SF ¶ 53. Sergeant Gervais asked Officer Cunningham if the officers on shore could see the fire boat and Officer Cunningham said yes. City SF ¶ 53.

---

[4]     The parties dispute facts surrounding this statement. The record supports that a reasonable juror could find the facts as I have recited them. With respect to Giroux's distance from the shore, I interpret Cohen's response as a request to strike and overrule it.

[5]     Giroux had learned earlier, at approximately 1:19 p.m., from fire dispatch that a suspect had run up the interstate after assaulting a woman by the Miss Portland Diner. Stipulated Facts for Ronald Giroux, Jr.'s Mot. for Summ. J. ("**Giroux SF**") ¶ 2 (ECF No. 94). Around 1:27 p.m., Giroux learned that a Portland Fire Department boat was going to the Back Cove area with the Portland Police for a subject who was in the water. Giroux SF ¶ 4. Although Officer Cunningham explained to some of the firefighters that Cohen was in a psychotic state, City SF ¶ 52, Giroux was at the firetruck and did not hear this explanation. Giroux SF ¶¶ 11-12.

At 1:44:50 p.m., Officer Cunningham got the life jacket and started to take off his duty gear in preparation to go into the water. City SF ¶ 54. Officer Cunningham started to enter the water, but once he saw the fire boat approaching, he stopped and returned to shore. City SF ¶ 55.

At approximately 1:45 p.m., Sergeant Rand advised Sergeant Gervais on the boat that Cohen was about 500 feet ahead of the fire boat and appeared to be face down. City SF ¶ 56. Sergeant Rand continued to direct Sergeant Gervais toward Cohen's location in the water. City SF ¶ 56. Sergeant Rand asked the police dispatcher if the MEDCU (ambulance) was close. City SF ¶ 57. The Deputy Fire Chief on the scene asked fire dispatch which MEDCU had been assigned. City SF ¶ 57. At 1:46:31 p.m., the fire dispatcher advised that a MEDCU had not been assigned to that particular location and that the MEDCU that was originally assigned had been waiting nearby but had just departed to transport CE to the hospital because her injuries were deemed serious enough for hospitalization. City SF ¶ 58. The Deputy Fire Chief immediately requested that another MEDCU be assigned and said he would further advise on best location, since it was still unclear where the fire boat would be able to beach.[6] City SF ¶ 59. This MEDCU assignment came twenty-three minutes after Cohen entered the water. City SMF ¶ 83.[7]

---

[6]    At the time, the Portland Fire Department had five MEDCU units (ambulances). Def. City of Portland's Reply Statement of Material Facts ("**City SMF**") ¶ 49 (ECF No. 117). However, all other Fire Department apparatuses (such as engine and ladder trucks) could provide the same emergency medical services (EMS), including advanced life support, as a MEDCU, and all apparatuses were staffed with personnel who could provide those advanced life support services. City SMF ¶ 49.

[7]    I have considered the City's objection and qualification, and find the record supports the fact as recited.

At approximately 1:46 p.m., the fire boat reached Cohen, and Sergeant Gervais and others on board were able to pull him out of the water and onto the boat. City SF ¶ 60. At approximately 1:47 p.m., Sergeant Gervais confirmed to dispatch that they had Cohen on board and would be landing the boat on shore. City SF ¶ 61. About one minute later, the boat beached and Portland officers waded into the water to meet the boat and carry Cohen to land. City SF ¶ 62. By approximately 1:49 p.m., the officers had gotten Cohen out of the boat and onto the beach. Body Worn Camera of Officer IL 26:16; City SMF ¶ 84.[8] The MEDCU had not yet arrived. City SMF ¶ 84.

## X.      Personnel Unsuccessfully Attempt Rescue Efforts

Officers placed Cohen on his side on the shore in a recovery position. City SF ¶ 62. A firefighter, who was also an advanced emergency medical technician ("**EMT**"), immediately attended to Cohen and tried to find a pulse. City SF ¶ 62. The firefighter/advanced EMT said: "I got nothing, no equipment. You know what I mean? The ambulance is on their way, but nothing we can do." Body Worn Camera of Sgt. Rand at 13:17-13:23 (ECF No. 92-19); City SMF ¶ 87. About 50 seconds later, the paramedic on the fire boat disembarked to assist. City SF ¶ 63. He assessed Cohen and approximately 45 seconds later, took off his winter jacket and placed it on Cohen's naked body. City SF ¶ 63. None of the personnel waiting on the shore had equipment ready to help Cohen, such as suction devices or blankets. City SMF ¶ 85.[9]

---

[8]      I have considered the City's qualification, and find the record supports the fact as recited.

[9]      I have considered the City's objection, and find the record supports the fact as recited.

About 30 seconds later, the crew from one of the firetrucks (a paramedic, advanced EMT, and basic EMT) arrived on the shore with a blanket and medical equipment and began administering first aid to Cohen. City SF ¶ 64. The firetruck had been waiting in the area, but it was too large to drive down the Back Cove walking trail, so the crew were transported closer to the shoreline in a police cruiser. City SF ¶ 64. At approximately 1:50 p.m., the MEDCU arrived on the scene and by 1:51 p.m. its personnel (a paramedic and an advanced EMT) also began administering care to Cohen. City SF ¶ 65.

Once Cohen had been pulled from the water and it was clear that the equipment on his firetruck would not be necessary, Giroux drove the truck away from the off-ramp, where it was an impediment to traffic. Giroux SMF ¶ 18.

At 2:29 p.m., Cohen arrived at Maine Medical Center and was given emergency care. City SF ¶ 66. He was pronounced deceased at 2:52 p.m. City SF ¶ 66. His cause of death was hypothermia and drowning. Giroux SF ¶ 17.

## XI.    Portland Police Training

Portland police officers receive training at both the state and local level, beginning with training through the Maine Criminal Justice Academy ("**MCJA**"). City SMF ¶¶ 5, 10. Subject to a limited exception for officers with significant prior law enforcement experience, all full-time Portland officers must complete the MCJA Basic Law Enforcement Training Program ("**Basic Training**").[10] City SMF ¶ 10.

---

[10]    If officers do have significant prior law enforcement experience, they may apply to MCJA for a Basic Training waiver. City SMF ¶ 10.

This is an 18-week (720-hour) residential program. City SMF ¶ 10. Basic Training covers a variety of topics, including federal and state constitutional law, lawful arrests, permissible searches and seizures under the Fourth Amendment, Maine criminal law, investigations in accordance with constitutional requirements, civil rights, domestic violence, interacting with and responding to people in mental health crises, protective custody, basic emergency medical care, substance abuse, crisis intervention, basic water safety,[11] basic first aid, mental health first aid, and priority of life protocols. City SMF ¶¶ 12–13, 20; MCJA Basic Law Enforcement Training Program Curriculum ("**MCJA Curriculum**") at PageID #809, 834 (ECF No. 111).

Once Portland officers complete Basic Training and graduate from the MCJA, they then complete the Portland Police Department's field training program. City SMF ¶¶ 22–23. Under this program, a new officer is paired with an experienced officer who provides one-on-one instruction, supervision, and guidance in the field. City SMF ¶ 24.

Since 2010, all Portland officers have been required to complete crisis intervention training within one year of their field training. City SMF ¶ 26. This Portland-specific training is in addition to the crisis training officers receive at the state level. MCJA Basic Training on handling crises includes instruction on initiating crisis intervention techniques, recognizing major indicators of a subject's mental or emotional state, and identifying factors which affect perception, such as a subject's

---

[11]     Officers are trained on the importance of extending their reach and relying on equipment, rather than on swimming skills. City SMF ¶ 17. The MCJA does not require swimming or water rescue performance to graduate and become a certified law enforcement officer. City SMF ¶ 19.

mental condition. City SMF ¶ 25; MCJA Curriculum at PageID #834. Portland's crisis intervention training is explicitly referenced in the Department's standard operating procedure on mental health crisis intervention. Portland Police Department Standard Operating Procedure #40F, "Mental Health Crisis Intervention and Protective Custody" ("**Mental Health SOP**") at PageID #567, 569 (ECF No. 92-9).

The Portland Police Department's crisis intervention training begins as a one-time 40-hour mental health training course developed by the National Alliance on Mental Illness. City SMF ¶ 27. This program covers best practices for law enforcement officers for their interactions with persons with a mental illness in crisis situations. City SMF ¶ 28. The Mental Health SOP instructs that when interacting with someone suspected to be experiencing a mental health crisis, officers should "[u]tilize [crisis intervention training] and other relevant training while following priority of life protocols to enhance scene security, public, officer and subject safety." Mental Health SOP at PageID #567. Under the Mental Health SOP, "[a]ll sworn personnel must complete relevant annual training to maintain proficiency."[12] Mental Health SOP at PageID #570.

The Portland Police Department also has standard operating procedures on the role and authority of law enforcement officers. City SMF ¶ 50; Portland Police Department Standard Operating Procedure #1 ("**Role and Authority SOP**") (ECF

---

[12]     Since 2010, the Portland Police Department has had a Behavioral Health Unit to respond to calls for service involving individuals with mental illness. City SMF ¶ 36. This unit includes a Behavioral Health Coordinator who supervises and manages the responder program, facilitates crisis intervention training, and collaborates with other local mental health care providers. City SMF ¶ 36.

No. 92-24). This standard operating procedure explains that while on duty, officers must, among other things, take appropriate action to "protect life and property" and "provide emergency first aid to the injured." Role and Authority SOP at PageID #603. The MCJA's Basic Training includes a course on basic aspects of emergency medical care, which trains officers on basic lifesaving techniques as first responders, while recognizing that they are not trained EMTs. City SMF ¶ 20.

## XII.   Training of Officers Involved

The Portland Police Department's policies comply with the MCJA's minimum standards. City SMF ¶¶ 31–32. The City asserts that all Portland officers are trained on its policies, including any updates or revisions. City SMF ¶ 31. Cohen does not dispute that all Portland officers completed MCJA Basic Training and the initial, one-time 40-hour Portland crisis intervention training.[13] City SMF ¶¶ 26–28. However, Cohen has shown that two of the officers involved in the events of April 12— Sergeant Gervais and Sergeant Rand—had not completed their annual crisis intervention training, contrary to the requirements of Portland's Mental Health SOP. City SMF ¶ 31; Mental Health SOP at PageID #570.

---

[13]      Sergeant Gervais completed cardiopulmonary resuscitation ("**CPR**") recertification training in 2016, but he was unsure at his deposition if he was CPR certified on April 12, 2020. City SMF ¶ 91; Dep. Tr. of Christopher T. Gervais 20:15-21:4 (ECF No. 92-8). Viewed in the light most favorable to Cohen, he has shown for present purposes that Sergeant Gervais was not CPR certified on April 12. The parties do not elaborate on CPR training, for example whether it was required under state or Portland training protocols, or why Sergeant Gervais's certification status was of particular importance given the number of other personnel on the scene, including fire department personnel with advanced life support training. City SMF ¶ 49.

## XIII.  Procedural History

Eric Cohen's father, John Cohen, filed suit as the next friend and personal representative of his son's estate against the City of Portland, Sergeant Gervais, Sergeant Rand, and John Doe (later identified as Ronald Giroux, Jr.). Compl. (ECF No. 1). Following amendments to his Complaint, all Defendants moved to dismiss the action. Defs.' Mot. to Dismiss (ECF No. 28). I dismissed Defendants Gervais and Rand from the action entirely, and I dismissed the Eighth Amendment claim against Defendant Giroux. Order on Defs.' Mot. to Dismiss (ECF No. 40). Cohen amended his Complaint again, Fifth Am. Compl. (ECF No. 46), and the case proceeded through discovery. After discovery closed and the City filed a notice of intent to file for summary judgment, Cohen sought to amend his Complaint again, this time to add allegations against the Portland Fire Department and to change "John Doe" to "Ronald Giroux, Jr." I allowed the name change, but not the new allegations. Order on Sixth Mot. to Amend Compl. (ECF No. 66). The remaining defendants—the City and Giroux—have now moved for summary judgment on all claims against them.

## LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is 'genuine' if the evidence 'is such that a reasonable jury could resolve the point in the favor of the non-moving party . . . .' " *Taite v. Bridgewater State Univ., Bd. of Trs.*, 999 F.3d 86, 93 (1st Cir. 2021) (quoting *Ellis v. Fid. Mgmt. Tr. Co.*, 883 F.3d 1, 7 (1st Cir. 2018)). "[A]nd a fact

is 'material' if it 'has the potential of affecting the outcome of the case[.]' " *Id.* (quoting *Pérez-Cordero v. Wal-Mart P.R., Inc.*, 656 F.3d 19, 25 (1st Cir. 2011)). Once the party moving for summary judgment has shown that no such dispute exists, the nonmoving party must respond with sufficient evidence to "establish the presence of a trialworthy issue." *Behlen v. Ascentria Care All.*, No. 2:21-cv-00317-JAW, 2023 WL 3231652, at *19 (D. Me. May 3, 2023) (quoting *McCarthy v. City of Newburyport*, 252 F. App'x 328, 332 (1st Cir. 2007)).

In reviewing a motion for summary judgment, I must view the record in the light most favorable to the nonmoving party and draw all reasonable inferences in his favor. *EdgePoint Cap. Holdings, LLC v. Apothecare Pharmacy, LLC*, 6 F.4th 50, 57 (1st Cir. 2021). But I am "not obliged either 'to draw unreasonable inferences or credit bald assertions or empty conclusions.' " *Theriault v. Genesis HealthCare LLC*, 890 F.3d 342, 348 (1st Cir. 2018) (quoting *Cabán Hernández v. Philip Morris USA, Inc.*, 486 F.3d 1, 8 (1st Cir. 2007)).

## DISCUSSION

Cohen asserts substantive due process and wrongful death claims against Giroux, and a substantive due process failure to train claim against Portland. Each Defendant has moved for summary judgment. I address the motions in turn.

## I.    Giroux's Motion for Summary Judgment

Giroux moves for summary judgment on all claims against him, which are: violation of Cohen's substantive due process rights under the Maine and federal

Constitutions (Counts II & III)[14] and liability under Maine's wrongful death statute (Count IV). Def. Ronald Giroux, Jr.'s Mot. for Summ. J. ("**Giroux's Mot.**") (ECF No. 99); *see* Sixth Am. Compl. ¶¶ 56–69 (ECF No. 69).

## A.    Substantive Due Process Claims

Cohen seeks redress for violations of his constitutional rights through 42 U.S.C. § 1983 and 5 M.R.S. § 4682.[15] He asserts that Giroux deprived him of life without due process of law. To make out a substantive due process claim under the Fourteenth Amendment, Cohen must show that the deprivation of his protected right was caused by government conduct. *Rivera v. Rhode Island*, 402 F.3d 27, 33–34 (1st Cir. 2005). There is no dispute that Cohen was deprived of life, which is a protected right.[16] The disagreement is whether Cohen can show that Giroux caused his son's death.

In general, a state actor's "failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 197 (1989); *see Souza v. Pina*, 53 F.3d 423, 427 (1st Cir. 1995) ("[T]he Due Process Clause does not require the state

---

[14]    Cohen names Giroux in both his individual and official capacities. Sixth Am. Compl. (ECF No. 69). Giroux asserts, and Cohen does not meaningfully contest, that the official capacity claims are not viable. Def. Ronald Giroux Jr.'s Mot. for Summ. J. ("**Giroux's Mot.**") 14 n.6 (ECF No. 99); Pl.'s Am. Obj. to Def. Ron Giroux'[s] Mot. for Summ. J. ("**Cohen's Obj. to Giroux's Mot.**") 3 n.1 (ECF No. 114). I thus analyze the claims against Giroux in his individual capacity.

[15]    Giroux asserts, and Cohen does not dispute, that the disposition of the federal constitutional claim (Count II) will also control the disposition of the Maine constitutional claim (Count III). Giroux's Mot. 4 n.1 (citing *Clifford v. MaineGeneral Med. Ctr.*, 2014 ME 60, ¶ 10 n.18, 91 A.3d 567). Accordingly, the following analysis applies to both claims.

[16]    "No State shall . . . deprive any person of life . . . without due process of law." U.S. Const. amend. XIV, § 1.

to protect citizens from 'private violence' in whatever form, including suicide."). However, an affirmative duty to protect may arise if the state creates or elevates danger to an individual. *DeShaney*, 489 U.S. at 201 ("While the State may have been aware of the dangers that [the plaintiff] faced in the free world, it played no part in their creation, nor did it do anything to render him any more vulnerable to them.").

A substantive due process violation may occur under the "state-created danger" exception to the general rule. To establish a cognizable state-created danger claim, a plaintiff must show:

> (1) that a state actor or state actors affirmatively acted to create or enhance a danger to the plaintiff;
> (2) that the act or acts created or enhanced a danger specific to the plaintiff and distinct from the danger to the general public;
> (3) that the act or acts caused the plaintiff's harm; and
> (4) that the state actor's conduct, when viewed in total, shocks the conscience.

*Irish v. Fowler*, 979 F.3d 65, 75 (1st Cir. 2020). Accordingly, I evaluate whether Giroux's conduct meets these requirements.[17]

### 1.  Created or Enhanced a Danger Specific to the Plaintiff

To establish the first two *Irish* requirements, a plaintiff must establish that a state actor "affirmatively acted to create or enhance a danger" specific to that plaintiff, as opposed to a danger to the public at large. *Irish*, 979 F.3d at 75. The

---

[17]    Cohen pursues this claim under the state-created danger theory of constitutional liability first contemplated in *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189 (1989), not under a direct-injury theory of constitutional liability under *County of Sacramento v. Lewis*, 523 U.S. 833 (1998). Cohen's theory, accordingly, must be that Giroux is responsible for the harm a third party inflicted on Cohen or Cohen inflicted upon himself; and not that Giroux directly inflicted the harm on Cohen. *See Jones v. Reynolds*, 438 F.3d 685, 695 (6th Cir. 2006).

affirmative act need not *greatly* enhance the danger to the plaintiff, it must simply enhance it. *Welch v. City of Biddeford Police Dept.*, 12 F.4th 70, 76 (1st Cir. 2021).

Giroux maintains that Cohen cannot establish these prongs, because Giroux's statement did not expose Cohen to a danger he otherwise would not have faced, and the possibility that Cohen heard the statement and it kept him from coming out of the water is too speculative. Giroux's Mot. 6. Cohen counters that Giroux's statement was a threat of bodily harm, and jurors could reasonably infer that it enhanced the danger to Cohen by suggesting that the people lining the shore were there to harm, not help, if he came out of the water. He further maintains that Giroux's threat could be heard on multiple body cameras, and given common understanding that sound travels easily over water, jurors could conclude that Cohen heard the comment without engaging in impermissible speculation.[18] Pl.'s Am. Obj. to Def. Ron Giroux'[s] Mot. for Summ. J. ("**Cohen's Obj. to Giroux's Mot.**") 4–5 (ECF No. 114).

Here, the record shows that a firefighter identified as Giroux could be heard on police body cameras saying: "tell him we're gonna kick his ass if he gets out of that water."[19] Giroux SMF ¶¶ 9–10. This statement was an affirmative threat of violence, directed at Cohen specifically, made just after Giroux arrived on the scene.[20] This

---

[18]    He also points out that Cohen's own yelling could be heard on the beach. Cohen's Obj. to Giroux's Mot. 4–5.

[19]    As I described above, the parties dispute whether Giroux made the statement and how loudly it was made. Based on the evidence, and drawing all inferences in Cohen's favor, a reasonable juror could find that Giroux made the statement, and that he made it loudly enough for Cohen to hear it in the water.

[20]    Giroux maintains that the comment was not directed at Cohen, because it began with "[t]ell him . . . ." Giroux's Mot. 9 & n.3. Even if Giroux was yelling to the officers already on the scene, a

threat did not *create* the danger that Cohen faced of remaining in the cold water for an unsafe length of time, but it could have *enhanced* the danger specific to Cohen by deterring him from coming out of the water. Cohen has demonstrated triable issues on the first two *Irish* requirements.

### 2.      Caused the Harm

To establish the third *Irish* requirement, a plaintiff must show that the state actor's conduct caused the plaintiff's harm. *Irish*, 979 F.3d at 75. "[I]nquiries into causation under § 1983 are cabined within common law tort principles." *Gutierrez-Rodriguez v. Cartagena*, 882 F.2d 553, 561 (1st Cir. 1989). Under Maine law, "[c]ausation need not be proved directly but may be inferred if the inference flows logically from the facts and is not unduly speculative." *Estate of Smith v. Salvesen*, 2016 ME 100, ¶ 21, 143 A.3d 780. Giroux asserts, and Cohen does not counter, that "but for" causation is the appropriate standard for state-created danger claims. Giroux's Mot. 7; Cohen's Obj. to Giroux's Mot. 5–8.[21]

Giroux argues that the record lacks sufficient evidence for a jury to find that his verbal threat caused Cohen's death. Giroux's Mot. 8. Cohen counters that a jury could make this causal finding inferentially, based not only on Giroux's conduct, but based on all of the state actors' conduct that day. Cohen's Obj. to Giroux's Mot. 6–8.

---

reasonable juror could nonetheless find that Giroux *also* meant for Cohen to hear it. Cohen, of course, was the only person in the water.

[21]      Giroux cites *Kaucher v. County of Bucks*, 455 F.3d 418, 432–33 n.10 (3d Cir. 2006), to support the application of the "but for" causation standard. The Third Circuit organizes its state-created danger requirements differently than the First Circuit. The *Kaucher* court appears to use the "but for" causation standard for what would be closer to the first requirement in the First Circuit's formulation of the state-created danger test (affirmative act that created or enhanced danger), rather than the third (act caused the harm).

Cohen is incorrect that I may consider other officers' conduct to determine whether Giroux's act caused Cohen's harm. *See Welch*, 12 F.4th at 76 ("Officers are not liable under § 1983 for the actions of other officers."). Instead, I must evaluate whether what *Giroux* did caused the harm, which in this case was Cohen's death by hypothermia and drowning. I am mindful that "increased risk is not itself a deprivation of life, liberty, or property." *Rivera*, 402 F.3d at 37–38. The officer's act must cause the harm. *Irish*, 979 F.3d at 75.

Examples help illustrate this causation requirement in the state-created danger context. In *Rivera v. Rhode Island*, a witness to a murder was shot dead in front of her house before she was able to testify against the accused. 402 F.3d at 30. Her mother brought substantive due process claims against state actors, including on a state-created danger theory of liability. *Id.* at 35. She alleged that officers promised her daughter protection from threats when she agreed to become a government witness, but then failed to deliver the protection she relied upon. *Id.* at 32. The First Circuit acknowledged that these unkept promises may have made the victim more vulnerable to the danger posed by the criminal defendant and his associates, but it concluded that increased risk was not enough to establish that state actors *caused* the deprivation. *Id.* at 37–38.

In *Irish v. Fowler*, officers investigating a kidnapping and rape contacted the suspect thereby tipping him off that the victim (the suspect's former girlfriend) had reported him, despite the victim's expressed concerns for her safety. 979 F.3d at 67–68. The accused then kidnapped and raped the victim again, and in the process of

fleeing, he killed and wounded several others. *Id.* The officers' failure to protect the victim created triable issues on a substantive due process claim, because the failure to protect was coupled with the officers' decision to contact the accused in violation of police procedure. *Id.* at 79. The officers' conduct did not just elevate the risk of harm to the plaintiff, it caused it.

Similarly, in *Kneipp v. Tedder*, police officers stopped an intoxicated couple on their way home by foot on a cold night. 95 F.3d 1199, 1201 (3d Cir. 1996). The officers allowed the husband to proceed home, while they continued to detain the wife. *Id.* at 1202. An officer then left the wife by herself on the side of the road, and she later fell to the bottom of an embankment and suffered grave injuries from her exposure to the cold. *Id.* at 1203. The court concluded that without the officer's conduct—separating the intoxicated wife from her husband and leaving her to navigate her way home alone on a cold night—a jury could find that the couple would have made it home together safely. *Id.* at 1209.

In *Irish*, the attacker only knew the plaintiff had reported him, and in *Kneipp*, the plaintiff was only alone and intoxicated on a cold night, because of the actions taken by police. By contrast, in *Rivera*, the plaintiff would have been known to the murder suspect and faced potential harm regardless of the officers' promise of protection. The officers in *Rivera* increased the risk to the plaintiff by failing to provide the promised protection, but they did not cause the harm. In *Kneipp* and *Irish*, the officers actually altered the course of events that followed, such that a jury could find that their conduct caused the plaintiffs' harms. Here, there is simply not

enough evidence in the record for a jury to conclude that absent Giroux's threat, Cohen would have survived.

Unlike the situations in *Kneipp* and *Irish*, Giroux's conduct did not alter the course of events that followed in some significant way. Cohen, after committing two violent assaults, fled police and entered the water rather than submitting to authorities.[22] He did not come out of the water despite being encouraged to do so. By the time Giroux arrived on the scene, Cohen had already been in the cold waters of the Back Cove for twenty minutes, with the rescue boat three minutes away. Absent Giroux's threat, the MEDCU would not have been assigned any earlier, and its emergency personnel would still have been eight minutes from attending to Cohen with their life-saving equipment. Giroux may have increased the risk to Cohen, as the officers did in *Rivera*, but he did not alter the status quo in a way that amounts to causation.

Moreover, I agree with Giroux that, based on this record, a jury would have to engage in impermissible "conjecture or speculation" to find that Giroux's act caused Cohen's harm. Giroux's Mot. 8 (quoting *Addy v. Jenkins*, 2009 ME 46, ¶ 12, 969 A.2d 935). In order to show that but for Giroux's threat Cohen would have survived, a jury would have to find that Cohen could have made the deliberate choice to come to shore while in a state of alleged psychosis, would have been able to get himself to shore after having been in the cold water for twenty minutes already, could have done so

---

[22]     As explained above, the Plaintiff's argument that the police forced Cohen to enter the water is unsupported. *See supra* note 2.

faster than the rescue boat ultimately did, and would not have died of hypothermia or drowning if he had started for the shore at the time the comment was made. In a case like this, where the harm was not inflicted by a third party, but rather was the result of the medical effects of prolonged exposure to cold water, proof that the affirmative act caused the harm becomes less obvious and exceeds the realm of common knowledge.[23]

While jurors may discern certain things without any improper speculation, for example, whether Cohen could have heard the comment or whether prolonged exposure to cold water generally may cause death by drowning or hypothermia, they would need to do more here. They would need to find that having been in the cold water for twenty minutes, Cohen could have exited the water on his own volition in the minutes following Giroux's threat, and either that MEDCU personnel could have delivered life-saving care once they began attending to Cohen eight minutes after Giroux's threat, or that he would not have needed their care in the first place, and therefore would not have died of drowning or hypothermia. This is because the harm—death by drowning or hypothermia—must have been caused by Giroux's act— the verbal threat of violence—for Cohen to sustain his state-created danger substantive due process claim. On this record, jurors would have to engage in

---

[23]    *Compare Johnson v. City of Biddeford*, 2:17-cv-00264-JDL, 2023 WL 2712861, at *4–8, *16 (D. Me. Mar. 30, 2023) (finding that the "sequence of events" could satisfy the causation requirement where a police officer made a landlord more agitated about a dispute with his tenants and the landlord then immediately went and shot some of the tenants), *with Daggett v. York Cnty.*, No. 2:18-cv-00303-JAW, 2021 WL 868713, at *37–38, (D. Me. Mar. 8, 2021) (finding causation requirement not met where record evidence did not link officer's failure to deliver a proper dose of medication to the plaintiff's later ailments), *aff'd*, No. 21-1374, 2022 WL 216565 (1st Cir. Jan. 25, 2022).

impermissible speculation to find this causal link.[24] Cohen has not demonstrated a triable issue of fact on the causation requirement.

### 3. Shocks the Conscience

To establish the fourth *Irish* requirement, the plaintiff must show "that the state actor's conduct, when viewed in total, shocks the conscience." *Irish*, 979 F.3d at 75. Unlike the other *Irish* requirements, which focus on the state actor's affirmative conduct, for this requirement, "all of the circumstances should be considered[,] . . . not just the defendant's affirmative acts." *Johnson v. City of Biddeford*, 2:17-cv-00264-JDL, 2023 WL 2712861, at *16 (D. Me. Mar. 30, 2023) (citing *Irish*, 979 F.3d at 75). Although Giroux's comment was gratuitous and inconsistent with his role on the scene, I need not resolve whether a reasonable jury could find that it shocks the conscience, because Cohen has failed to demonstrate a triable issue on whether the comment *caused* the harm. Giroux is entitled to summary judgment on the substantive due process claims.[25]

---

[24]     Cohen did not designate any expert witnesses in this case. Def. Giroux's Reply Statement of Material Fact ("**Giroux SMF**") ¶ 20 (ECF No. 119). A medical expert may have been able to close these evidentiary gaps by providing an opinion on these technical questions. But as it stands, there is nothing in the record that allows me to find that a jury could make these necessary leaps.

[25]     Because I find that Giroux did not commit a constitutional violation, I need not analyze whether he is entitled to qualified immunity. As the First Circuit recently explained:

> Whether an official is entitled to qualified immunity is governed by a two-prong analysis, which a court may resolve on either prong. The first prong asks "whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right"; the second prong asks whether that right "was clearly established at the time of the defendant's alleged violation."

*Penate v. Sullivan*, 73 F.4th 10, 17 (1st Cir. 2023) (quoting *Maldonado v. Fontanes*, 568 F.3d 263, 269 (1st Cir. 2009)).

### B.      Wrongful Death Claim

Cohen also asserts a wrongful death claim against Giroux. However, a cause of action under Maine's wrongful death statute, 18-C M.R.S. § 2-807, is "dependent on a cause of action that the deceased would have possessed had death not ensued." *Shaw v. Jendzejec*, 1998 ME 208, ¶ 6, 717 A.2d 367. In other words, this claim does not "confer any separate cause of action, but depends on an independent cause of action to exist under the law." *Jackson v. Town of Waldoboro*, 751 F. Supp. 2d 263, 276 n.13 (D. Me. 2010).

Cohen has not asserted any independent cause of action against Giroux other than the substantive due process claims discussed above. Because I have found no triable issue of material fact on those claims, his wrongful death claim based on the same theory of liability cannot proceed either.

## II.    City of Portland's Motion for Summary Judgment

The City has moved for summary judgment on the one claim against it: that it violated Cohen's substantive due process rights by failing to adequately train its police officers (Count I). Def. City of Portland's Mot. for Summ. J. ("**City's Mot.**") (ECF No. 97); *see* Sixth Am. Compl. ¶¶ 49–55.

A municipality may be held liable under 42 U.S.C. § 1983 for constitutional violations committed pursuant to a municipal custom, policy, or practice. *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 690 (1978). A municipality's failure to train its employees may form the basis for § 1983 liability. *City of Canton v. Harris*, 489 U.S. 378, 387 (1989). For such claims to be successful, "a municipality's failure to train its employees in a relevant respect must amount to 'deliberate indifference to the rights

of persons with whom the untrained employees come into contact.' " *Connick v. Thompson*, 563 U.S. 51, 61 (2011) (quoting *Canton*, 489 U.S. at 388). And, the identified failure in training must be "closely related to the ultimate injury." *Young v. City of Providence ex rel. Napolitano*, 404 F.3d 4, 26 (1st Cir. 2005) (quoting *Canton*, 489 U.S. at 391).

The City maintains that it is entitled to summary judgment here because (1) no Portland police officer committed a constitutional violation; (2) Cohen has not produced evidence of a pattern of similar violations, or otherwise demonstrated deliberate indifference; and (3) Cohen has not produced evidence that the City's lack of training caused Cohen's death. City's Mot. 5–20. Cohen responds that officers did violate Cohen's constitutional rights, that the unconstitutional consequences of the City's failure to train were so obvious that he did not need to show a pattern of similar violations, and that the lack of training caused Cohen's death. Pl.'s Am. Obj. to Def. City of Portland's Mot. for Summ. J. ("**Cohen's Obj. to City's Mot.**") 6–20 (ECF No. 112).

Cohen's failure to train claim is unusual, because the individual defendant in this case is a Portland firefighter, not a Portland police officer.[26] Even if I had found that Giroux, a Portland firefighter, violated Cohen's constitutional rights, that violation could not form the basis for a failure to train claim against the City premised on how it trains police officers. Perhaps due to this unusual set-up, Cohen's brief does

---

[26]    Two Portland police officers were dismissed from this case at the motion to dismiss stage. Order on Defs.' Mot. to Dismiss (ECF No. 40).

not zero in on how an identified constitutional violation by specific Portland employees connects to the City's failure to train police officers on a particular topic.

However, read in the light most favorable to Cohen, he maintains that the following amount to constitutional violations by Portland police officers: (1) Officer IL's approach of Cohen as he lay naked next to the Back Cove; (2) officers' failure to attempt additional rescue efforts while Cohen remained in the water; (3) officers' failure to properly use on Cohen crisis intervention techniques for those in mental health crises; (4) officers' failure to initiate proper rescue efforts as soon as Cohen was out of the water; and (5) officers' failure to get the right rescue personnel on the scene, ready to assist, once Cohen was out of the water. While I question whether any of these actions or failures to act, either individually or in combination, could amount to a substantive due process violation, I assume that they do for the sake of efficiency.[27] Even assuming predicate constitutional violations, Cohen's failure to train claim fails as a matter of law because he has not created triable issues on whether: (1) there was a pattern of violations or other evidence of deliberate indifference; (2) the City failed to train officers on the relevant topics; and (3) there exists a causal link between any lack of training and any violation.

---

[27]     *See Ross v. Town of Austin, Ind.*, 343 F.3d 915, 918 n.1 (7th Cir. 2003) (declining to address whether officer's actions amounted to constitutional violations where plaintiff's failure to train claim was deficient as a matter of law). *See generally Rhode Island v. Shell Oil Prods. Co.*, 35 F.4th 44, 53 (1st Cir. 2022), *cert. denied* 143 S. Ct. 1796 (2023) (internal quotations and citations omitted) (taking the " 'even if' approach" consistent with the judicial "credo . . . that 'if it is not necessary to decide more, it is necessary not to decide more.' ").

### A.   No Pattern of Violations or Other Evidence of Deliberate Indifference

The deliberate indifference requirement for failure to train claims is typically established through "a 'pattern of similar constitutional violations by untrained employees . . . .' " *Gray v. Cummings*, 917 F.3d 1, 14 (1st Cir. 2019) (quoting *Connick*, 563 U.S. at 62). A pattern is evidence "that municipal decisionmakers either knew or should have known that training was inadequate," but remained deliberately indifferent to its "unconstitutional effects." *Id.* At the same time, a plaintiff may show deliberate indifference without demonstrating any pattern, where constitutional violations are a " 'highly predictable consequence' " of the failure to train employees on a particular topic. *Young*, 404 F.3d at 28 (quoting *Brown v. Bd. of Cnty. Comm'rs of Bryan Cnty. Ok.*, 520 U.S. 397, 409 (1997)); *see also Canton*, 489 U.S. at 390 & n.10 (explaining that failing to train police officers on constitutional limitations to the use of deadly force, while equipping them with firearms in a job that requires arresting fleeing felons, would so obviously lead to constitutional violations that it would demonstrate deliberate indifference to those rights).

Cohen does not identify a pattern of constitutional violations by the City's officers, so he must show deliberate indifference by the City another way. *Young v. City of Providence ex rel. Napolitano*, 404 F.3d 4 (1st Cir. 2005), and *Gray v. Cummings*, 917 F.3d 1 (1st Cir. 2019), provide examples of how non-pattern failure to train cases may succeed or fail at the summary judgment stage.

In *Young*, the plaintiff's son, an off-duty Providence police officer, was fatally shot by on-duty officers when he responded to an emergency under the city's "always

armed/always on-duty" policy. 404 F.3d at 9. Young provided evidence that the city offered little-to-no training on the danger of misidentifications under the policy. *Id.* at 28–29. He also provided testimony from the police commissioner and others that the always armed/always on-duty policy was inherently dangerous and that specific training and protocols were necessary to avoid friendly fire shootings of off-duty officers. *Id.* at 18. This evidence was enough to send the deliberate indifference question to a jury, even without a pattern of previous violations. *Id.* at 29 ("[T]he jury could find that the department knew that a friendly fire shooting in violation of the Fourth Amendment was a predictable consequence of the [police department's] failure to train on on-duty/off-duty interactions, and therefore that the department was deliberately indifferent to [the plaintiff's] constitutional rights.").

By contrast, in *Gray*, the plaintiff failed to overcome her lack of pattern evidence. The plaintiff, who had been diagnosed with bipolar disorder, was tased by an officer during an on-the-street encounter. 917 F.3d at 5–7. She brought an excessive force case, which included a failure to train claim against the municipality for deficient training of officers on interacting with people with mental illnesses. *Id.* at 13–14. Without a pattern of similar excessive force violations to present, the plaintiff instead offered expert testimony on appropriate police practices for interactions with people with disabilities. *Id.* at 14. She then argued that this testimony, coupled with her own encounter with the officer, sufficed to send the failure to train claim to a jury. *Id.* The First Circuit disagreed. Her task, the court explained, was not simply to identify faults in the municipality's training. To survive

summary judgment, she needed to produce evidence "that the Town knew or had reason to believe that [its training] had unconstitutional effects." *Id.* Without this evidence, there was no genuine issue of material fact on whether the Town was deliberately indifferent to the risk of similar constitutional violations. *Id.*

Cohen's evidence falls short of what the First Circuit deemed insufficient in *Gray*. He asserts that his encounter with police that day itself establishes the City's deliberate indifference to the risk of constitutional violations. Cohen's Obj. to City's Mot. 18 (asserting that video evidence of the encounter provides "sufficient evidence to establish that the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need."). But what happened that day, by itself, cannot establish that the City knew or should have known of the risk of constitutional violations. Cohen does not, for example, point to any testimony by City policymakers that may close that evidentiary gap. *Cf. Young*, 404 F.3d at 18, 28–29. Nor does he identify a total absence of training in an area where it would obviously be required to avoid constitutional violations. *Cf. Canton*, 489 U.S. at 390 & n.10. Without any evidence—pattern or otherwise—that the City was deliberately indifferent to a particular risk of constitutional violations, Cohen cannot make out a failure to train claim.

### B.    Officers Were Trained on Relevant Topics

The Supreme Court has cautioned: "[t]hat a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability" onto the

municipality. *Canton*, 489 U.S. at 390. Instead, "the training program as a whole must be found faulty." *Calvi v. Knox Cnty.*, 470 F.3d 422, 429 (1st Cir. 2006).

Here, Cohen does not dispute that Portland requires that all officers complete the 40-hour crisis intervention training developed by the National Alliance on Mental Illness. City SMF ¶¶ 26–28.[28] Nor does he dispute that this training is in addition to the MCJA Basic Training required by the state, which also covers responding to people in crises, including those displaying signs of mental illness. City SMF ¶¶ 12–14, 20; MCJA Curriculum at PageID #809. The City also requires annual crisis intervention training for officers to maintain proficiency. City SMF ¶¶ 29–30. While two of the officers on the scene that day failed to complete this annual training, they did complete their MCJA Basic Training and Portland-specific 40-hour crisis intervention training. City SMF ¶ 31.

Cohen's "more" or "better" training argument is foreclosed by precedent. *See Canton*, 489 U.S. at 391 ("Neither will it suffice to prove that an injury or accident could have been avoided if an officer had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct."). It is not enough for Cohen to show that these two officers failed to complete annual training.[29] To create a triable issue, he must present facts that bear on the defectiveness of the training program

---

[28]    Cohen qualifies, rather than admits, these statements of fact. However, in each qualification, he admits the fact asserted, and then adds a new fact. This amounts to an admission of the original asserted fact.

[29]    This argument is a nonstarter for the independent reason that the two officers who failed to complete annual training were dismissed from this suit, Order on Defs.' Mot. to Dismiss, and their conduct therefore cannot provide an underlying constitutional violation for Cohen's failure to train claim. *See Young v. City of Providence ex rel. Napolitano*, 404 F.3d 4, 26 (1st Cir. 2005).

as a whole. *Calvi*, 470 F.3d at 429. As I have observed before, "[i]t is doubtful that any plaintiff can survive summary judgment on a claim for failure to train" where the relevant municipal actors "did receive the specific training at issue, and it is merely the frequency of the training that is at issue." *Penn v. Knox Cnty.*, No. 2:11-cv-00363-NT, 2013 WL 5503671, at *31 (D. Me. Sept. 30, 2013). Because the officers did receive training on the relevant topics, Cohen's failure to train claim fails as a matter of law.

### C.   No Evidence of Causal Link Between Asserted Lack of Training and Alleged Constitutional Violations

In failure to train cases, the plaintiff must demonstrate that the deficiency in the municipality's training program is "closely related" to the plaintiff's "ultimate injury." *Canton*, 489 U.S. at 391. Indeed, a direct causal link between the challenged municipal policy and the alleged constitutional violation is essential in *any* claim of municipal liability under § 1983, not just failure to train claims. *Id.* at 385.

Cohen argues that he has satisfied the causation requirement by identifying the failure of two officers to complete annual crisis intervention training and by citing video recordings from April 12, 2020. Cohen's Obj. to City's Mot. 20. But this evidence does not, by itself, connect a potential lack of training to what happened to Cohen. For example, it does not explain how additional training could have changed the way officers responded to him.[30] *Cf. Young*, 404 F.3d at 29 (identifying specific, missing training on officer misidentification, coupled with testimony from municipal officials that officers tend to fall back on training in the face of high stress evaluations of

---

[30]      And, as described above, *supra* note 30, conduct by these two officers cannot form the basis for failure to train liability against the City.

threat levels by unknown armed individuals). This "direct causal link" is essential to establish municipal liability. *Canton*, 489 U.S. at 385. Without it, Cohen cannot make out a failure to train claim against the City.[31]

Because Cohen has failed to create any triable issues of fact on his failure to train claim, the City is entitled to summary judgment.

## CONCLUSION

For the reasons stated above, the City of Portland's Motion for Summary Judgment (ECF No. 97) and Ronald Giroux, Jr.'s Motion for Summary Judgment (ECF No. 99) are **GRANTED**.

SO ORDERED.

/s/ Nancy Torresen_____
United States District Judge

Dated this 27th day of November, 2023.

---

[31] Cohen also references the Portland Police Department's Standard Operating Procedure on "Law Enforcement Role and Authority," which includes instruction on protecting life and property and providing emergency first aid. Cohen's Obj. to City's Mot. 18. He also notes the existence of a Behavioral Health Unit available to help respond to calls for service involving individuals displaying signs of mental illness. Cohen's Obj. to City's Mot. 18–19. And he points out that Sergeant Gervais did not know if he was CPR certified when he participated in fire boat rescue efforts. Cohen's Obj. to City's Mot. 18 n.2. With respect to this training policy, resource, and lack of training, he does not point to any evidence beyond the facts of what happened that day, which I have already explained is insufficient to demonstrate the deliberate indifference and causation requirements of a failure to train claim.